**TOWNSHIP OF LOWER MERION**

v.

**QED, INC., Appellant.**

Commonwealth Court of Pennsylvania.

Argued Oct. 5, 1998.
Decided Aug. 13, 1999.
Reargument Denied and
Reconsideration Granted in Part
Oct. 22, 1999.

Albert C. Oehrle, Norristown, for appellant.

Gilbert P. High, Jr., Norristown, for appellee.

Before DOYLE, J., FLAHERTY, J., and MIRARCHI, Jr., Senior Judge.

FLAHERTY, Judge.

The first class Township of Lower Merion (Township) filed a complaint in equity and law against a general contracting company, QED, Inc. (QED) on October 16, 1991 in the Montgomery County Court of Common Pleas (trial court), attempting to enforce the provisions of the local business privilege tax (the Business Privilege Tax) enacted pursuant to the Local Tax Enabling Act (LTEA), requiring the registration of a trade or business with the Township and the payment of a registration fee

and of a tax based upon the company's gross receipts.[1]

Following a bench trial, the trial court entered an "Adjudication and Decree Nisi" entering judgment in favor of the Township and against QED in the amount of $23,412. Following the filing of timely exceptions and argument thereon, the trial court entered an "Opinion and Final Decree" dismissing the exceptions and directing that the Decree Nisi become the Final Decree of the Court. QED appeals. We reverse the trial court's judgment entered for the Township and affirm the denial of attorney fees.

QED is a Pennsylvania business corporation with its principal place of business located in Radnor Township, Delaware County. QED performs building improvements, including residential alterations, repairs and remodeling. QED has never maintained an office in the Township. When QED performs residential improvements in the Township, a representative visits the site, determines the work to be done, offers designs, offers a proposal with a price for the job, contracts directly with the property owner, and assumes responsibility for the completion of the tasks as required by the contract. With the exception of the initial visit to the site, all employees of QED work at its office in Radnor Township.

QED subcontracts its work to mechanical subcontractors, one of whom acts as the liaison between QED and the other subcontractors. QED does not own or operate a truck or other construction equipment. QED has been licensed as a contractor to do business and has paid a contractor's licensing fee in the Township every year since 1977.[2]

Within the Township Code, the Township has adopted both ordinances and regulations relating to the imposition and enforcement of the Business Privilege Tax separate and apart from the ordinances and regulations relating to the licensing of contractors.[3]

---

1. The Local Tax Enabling Act is the Act of December 31, 1965 P.L. 1257, No. 511, 53 P.S. §§ 6901–6924. The Township's Business Privilege Tax was authorized pursuant to the LTEA at 53 P.S. § 6902(12).

   While the Township's Business Privilege Tax was authorized by the LTEA, it also is a tax that falls within the grandfathering provisions of section 533 of the Local Tax Reform Act (LTRA) at 72 P.S. § 4750.533 (b), which provides that those business privilege taxes and mercantile taxes in existence on November 30, 1988 may continue to be collected, but no further taxes on the gross receipts of any merchant or business privileges may be imposed. The LTRA prohibits both the enactment of new mercantile gross receipts taxes and prohibits the broadening of existing mercantile gross receipts taxes. The Local Tax Reform Act is the Act of December 13, 1998, P.L. 1121, 72 P.S. §§ 4740.101–4750.3112.

2. The contractor's licensing fee is separate and distinct from the Business Privilege Tax or the "registration" requirement for the Business Privilege Tax, as noted by a footnote in the Ordinance cross-referencing the provisions pertaining to the licensing of contractors generally to Chapter 69, Contractor Licensing.

3. The provisions of the Business Privilege Tax are codified in the LOWER MERION CODE (Township Code), Ordinance No. 1778, adopted December 15, 1976, and *as amended*, Article IV, Chapter 138 (beginning with section 138–40 through and including section 138–54) (R.R. at 13a–24a), and which provides, in pertinent part, that:
   *Registration of business or trade required.*
   "... [E]very person desiring to continue to engage in or hereafter to begin to engage in a business, trade, occupation or profession **at an actual place of business in the Township** shall ... make application with the Secretary [of the Township] for registration for each place of business in the Township and if such person has no actual place of business within the Township, then one (1) registration.... Such certificate shall be conspicuously posted at each place of business within the Township at all times." [Emphasis added.] Section 138–41.
   *Imposition of tax.*
   "Every person engaging in a business, trade, occupation or profession in the Township shall pay an annual business privilege tax for the year beginning January 1, 1981 and for each tax year thereafter, a the rate of one and five-tenths mills (1.5) on such person's gross receipts." Section 138–42.

The Township contacted QED in 1989 and requested that it register for the Business Privilege Tax. QED requested the legal basis of its obligation to pay the tax. The Township secured a legal opinion from the Township Solicitor and forwarded that to QED.

The Township interprets its code and regulations so as to impose the Business Privilege Tax upon contractors for work performed within the Township, regardless of the location of the contractor's offices. Radnor Township enforces an identical tax in the same manner. QED has paid the Radnor Township tax in the most recent tax year. The record contains no evidence concerning whether the corporation paid the Radnor Township tax in any of the previous years.

The Township Code at section 138–41, relating to the Business Privilege Tax, requires persons, including contractors, who engage in business within the Township to make application for registration at least once each year (Registration). The annual registration requirement is distinct from the contractor's licensing fee. Payment of the contractor's licensing fee does not satisfy the requirement that businesses which are also subject to the registration requirement complete the annual Registration. QED has never complied with the registration requirement of the Business Privilege Tax Article of the Township Code.

Between June 7, 1977 and September 25, 1990, QED took out building permits from the Township's Code Enforcement Office authorizing QED to perform $4,323,-585 worth of building construction work at various properties in the Township. The trial court determined that the building permits fairly represent the gross receipts from the work performed by QED in the Township during the years in question.[4] QED has never filed a Business Privilege Tax Return, as outlined in section 138–45 of the Township Code, which is imposed on persons subject to the Business Privilege Tax.

The trial court further determined that, based on the gross receipts as represented by the building permits, if QED is legally obligated to comply with the Township Code and regulations, the Township produced evidence proving the amounts of the obligations as follows:

*Business, Trade, Occupation or Profession* is defined as

"[a]ny business, trade, occupation or profession in which there is offered any service or services to the general public or a limited number thereof, including but not limited to ... electrical, plastering, bricklaying, carpentry, heating, ventilating, plumbing and painting contractors engaged in the class of heavy building or other construction of any kind or in the alteration, maintenance or repair thereof." Section 138–40. *Gross Receipts* are defined as including,

"the gross amount of cash, credits or property of any kind or nature received in both cash and credit transactions allocable or attributable to the Township by reason of any sale made ..... service rendered (including labor and any materials employed in or becoming part of the service) or commercial or business transactions in connection with any business, trade, occupation or profession ..." Section 138–40.

Further, the Finance Director of the Township is empowered by the Township Code to make rules and regulations consistent with the Code relating to the interpretation and application of the Code or to any matter affecting the administration and enforcement thereof.

With respect to contractors, since 1976 (prior to the adoption of the LTRA) the Regulations specifically provide that, "[a] contractor or subcontractor, resident or nonresident, engaged in the Township in the business of erecting buildings, or otherwise altering, repairing or improving real property, or other major construction work, is required to report as gross receipts all receipts derived from the performance of such contract."

4. The Township levies its Business Privilege Tax on the gross receipts of businesses at the rate of one mill for every dollar of gross receipts from January 15, 1977 through December 31, 1980 and at the rate of 1.5 mills for every dollar of gross receipts from January 1, 1981 to the present.

| | |
|---|---|
| Delinquent registration fees: | $ 140.00 |
| Fine for failure to register: | 4,800.00 |
| Delinquent tax on gross receipts: | 6,485.00 |
| Penalty on delinquent tax obligation: | 649.00 |
| Interest on delinquent tax obligation: | 11,338.00 |
| Total due | $23,412.00 |

■ Appellate review of a tax proceeding is limited to determining whether there is proof of an abuse of discretion, a lack of supporting evidence, or a clear error of law. *In re Pennsylvania Easter Seal Society*, 67 Pa.Cmwlth. 94, 445 A.2d 1369 (1982); *Appeal of Chartiers Valley School District*, 67 Pa.Cmwlth. 121, 447 A.2d 317 (1982), *appeal dismissed* 500 Pa. 341, 456 A.2d 986 (1983).

QED raises the following issues to this court:

1) Did the lower court abuse its discretion in finding that from 1977 through 1990 QED's individual transactions arose to "actual places of business" under the Ordinance so that QED maintained an actual place or places of business in the Township, where QED was a general contractor performing residential improvements at discrete job sites within the Township while its sole business office at all times was in Radnor Township?

2) Did the lower court abuse its discretion in concluding that QED, which never has conducted its business from an "actual place of business" in the Township, was nevertheless from 1977 through 1990 liable for payment of the Township's business privilege tax?

3) Did the lower court abuse its discretion in concluding that the Township did not engage in a selective prosecution of QED?

4) Did the lower court abuse its discretion in concluding that QED was not entitled to an award of counsel fees where the Township wrongfully commenced and prosecuted this case against QED in the face of well-settled law?

5) Is QED liable for the payment of the Township's Business Privilege Tax?

■ QED argues that the individual transactions that occur within the Township are outside the scope of a tax on the "privilege" of doing business in the Township because the privilege being taxed is the maintenance of an actual, physical, permanent "place of business" or, as the Supreme Court has characterized it, a "base of operations." *See Gilberti v. City of Pittsburgh*, 511 Pa. 100, 511 A.2d 1321 (1986) (discussion *infra*). We agree.

This very issue of a tax on individual business transactions of foreign-based corporations falling outside the scope of a municipality's business privilege tax was addressed by this court in *Airpark International v. Interboro School District*, 677 A.2d 388 (Pa.Cmwlth.1996), *affirmed* — Pa. ——, 735 A.2d 646 (1999).[5]

---

5. On appeal, the Supreme Court recently issued its July 21, 1999 Order and Opinion disposing of the *Airpark Int'l* appeal at — Pa. ——, 735 A.2d 646 (1999; 1999 Pa. LEXIS 2114). An equally divided Supreme Court issued a *per curiam* order which affirmed the order of the Commonwealth Court. Because the Supreme Court was equally divided as to the decision, neither the opinion in support of affirmance or the opinion in support of reversal is cited or relied upon by this Court in this decision. We note that both Supreme Court opinions in *Airpark Int'l* rely upon the *reasoning* in *Gilberti* and support the outcome of this matter (QED).

We note that while the reasoning in *Airpark Int'l* is sound and applicable to the present instance, the facts of the *Airpark Int'l* substantially differentiate that case from our decision in this matter, since the *Airpark Int'l* case upheld a tax of a *resident* parking lot operator, which was enacted by the municipality as a "transaction tax" as opposed to the present instance where the municipality enacted a "business privilege tax", taxing the *gross receipts* of individual transactions of a business based outside the municipality with no "base of operations" within that municipality.

In *Airpark Int'l*, the trial court declared the taxing of fees paid for the transactions in parking lots to be a "business privilege tax" as opposed to a transaction tax. Both the majority and dissenting opinions in *Airpark Int'l* agree that a business privilege tax may only be imposed on gross receipts arising out of a "base of operations," based upon the Supreme Court's criteria enunciated in *Gilberti*.

In *Gilberti*, the Supreme Court explained the difference between a transaction tax and a business privilege tax. That case involved a challenge to a tax on "every person engaging in any business in the City... at the rate of six mills on each dollar of volume of the gross annual receipts."

The Supreme Court held in *Gilberti* that this tax was a business privilege tax, as authorized by the LTEA, and the measure of the tax could include the gross receipts from out-of-City activities contributed to by the maintenance of a base of operations within the City. In so holding, the Supreme Court recognized that the LTEA permits taxes, both on individual business transactions and on privileges to do business in a municipality, but as separate subjects of taxation.

> "The 'privilege' of engaging in business within the City, which the [LTEA] establishes as a subject that may be taxed, must be regarded as being separate and apart from 'transactions' within the City that may be taxed. To regard otherwise would be to ignore the significance of the two subjects for taxation having been separately stated in the [LTEA]."

*Gilberti* at 511 Pa. 106, 511 A.2d at 1324.

In *Gilberti*, the Supreme Court also differentiated between a business privilege tax and a transaction tax, outlining the characteristics of a transaction tax as follows:

> "For any given business, transactions occurring outside the City frequently have a substantial relationship to transactions occurring within the City. Out-of-city transactions may in numerous ways be benefited by the fact that the taxpayer maintains an office within the City, but the fact remains that out-of-City transactions are not transactions within the City, and the [LTEA] has conferred power upon the City to tax only transactions 'within the limits' of the City."

*Gilberti* at 511 Pa. 104–105, 511 A.2d at 1324.

This Court has already recognized what the Supreme Court has stated regarding the business privilege tax:

> "It is to be emphasized that the plain language of the LTEA provides for taxes to be levied upon privileges within the City. In enacting such a provision, the legislature surely recognized that the exercise by a taxpayer of the privilege of doing business within a taxing jurisdiction constitutes far more than the sum of individual transactions and activities which are consummated or performed within the territorial limits of the taxing entity. Indeed, having a place of business within the City enables the taxpayer to have a base of operations from which to manage, direct, and control business activities occurring both inside and outside the City limits. Further, the City office provides a place from which to solicit business, accept communications, conduct meetings, store supplies, and perform office work. All of these activities are, in the usual course, necessary to any business operation. This is so irrespective of whether the business performs services at job sites outside the City."

*Airpark Int'l.* at 392, *citing Gilberti* at 511 Pa. 109, 511 A.2d at 1326.

> "The difference then between a business privilege tax and a transaction tax is not just the stated subject of the tax, but how the tax is measured. A business privilege tax is a tax imposed on all of the gross receipts from all of the businesses' activities anywhere, so long as the base of operations within the politi-

cal subdivision contributes to those activities... A transaction tax, however, is imposed on the receipts from the designated transactions that are actually performed within the taxing entity, because its subject is only the transaction and not the privilege of engaging in a business that allows the transaction to be consummated."

*Airpark Int'l.* at 392.

Under this criteria, QED is responsible for paying the business privilege tax imposed by Radnor Township, the base of QED's operations. It is not, however, liable for another "business privilege tax" where it does not maintain a base of operations, such as an office, conduct meetings or perform office work, i.e. Lower Merion Township.

Under the LTEA, QED is only responsible for the payment of business privilege taxes on gross receipts to ONE municipality for the privilege of having a base of operations.[6] If Lower Merion Township is permitted to collect the business privilege taxes from QED, then the home municipality, Radnor Township, would be denied those revenues.

The Township seeks to tax the gross receipts of each individual transaction that occurs within its district.[7] As we have already stated, the Supreme Court has recognized that the LTEA permits taxes on both individual transactions and business privileges, but only as *separate* subjects of taxation. *Gilberti.* Therefore a business privilege tax *cannot* also tax individual transactions. In addition, since the passage of the LTRA in 1988, no new

taxes on the gross receipts of any business are permitted to be imposed. Consequently, if the Township did not have a tax on the gross receipts of the individual transactions of QED and other similarly situated merchants in effect in 1988, the LTRA prohibits the Township to enact any such tax now, or, to broaden an existing tax, such as this Business Privilege Tax, to encompass individual transactions.

QED is not a corporation with a base of operations in the Township and therefore is not subject to the Township's Business Privilege Tax. In this instance, the Township does not recognize the Business Privilege Tax for what the LTEA intended it to tax – the *privilege* of "having a base of operations," not the privilege of performing the underlying transactions. *Gilberti.* By imposing the tax on QED in this manner, the Township seeks to tax the gross receipts from the individual transactions which occur within its boundaries.

The Township is obviously attempting to circumvent the LTRA by broadening its permitted taxation of gross receipts to include individual transactions as business privileges because it is prohibited by LTRA from enacting a *new* tax on gross receipts of business privileges. The Township, however, has exceeded the bounds permitted by the legislation of the LTEA to assess and collect on the business privilege which was grandfathered in by the LTRA. It is clear that QED is not liable for payment of the Business Privilege Tax to Lower Merion Township.

---

6.  Where a company has more than one base of operations, however, Section 8 of the LTEA, 53 P.S. § 6908, has been interpreted by the courts to provide that the taxpayer must receive credit for gross receipts taxes paid to another municipality where the base of operations exists and from the receipts generated by that office. *See Gilberti, Airpark Int'l.*

7.  Evidence of this is the testimony of Patricia S. Conroy (Conroy), who for twenty years has had the full-time job to collect the occupation,

mercantile and business privilege tax for the Township, who testified on cross-examination:

Q.  Are you taking the position that the property [being improved] located within the jurisdiction is a place of business?
A.  His service is his business.
Q.  Is his service a place of business?
A.  His service is what is being paid for, which is a receipt, which is what the Township is saying he is doing and requesting tax payment on.

██ In addition to the taxes and the penalties and interest related to the taxes that the Township claims QED owes, the Township also claims that QED should pay the "registration fees" required by Section 138–41 of the Business Privilege Tax and should also pay the associated penalties for non-payment of the registration fees. We disagree.

Article IV of the Township Code, entitled "Business Privilege Tax" at Section 138–41 requires, "every person desiring to continue to engage in or hereafter to begin to engage in a business, trade, occupation, or profession at *an actual place of business in the township* ... to make application with the Secretary for registration for each place of business in the township, and if such person has no actual place of business within the township, then one registration."[8] [Emphasis added].

This section was enacted in 1976, prior to the LTRA, which now prohibits the broadening of any existing tax. The registration requirement is contained within an article of the ordinance which deals solely and completely with the Business Privilege Tax. At the time of the enactment of this section, it may have been the intention of the Township to tax both business privileges and the individual transactions of businesses as one tax.

However, since the enactment of this language in this section of the Township Code in 1976, the Supreme Court has made it clear that a business privilege tax cannot also tax individual transactions.

Therefore, this section of the Township Code cannot be interpreted to permit the Township to tax both a base of operations and the underlying individual·transactions. Consequently, this section can now only apply to those persons and businesses who are subject to the Township's Business Privilege Tax.

Since QED is not subject to the Township's Business Privilege Tax, clearly, this section does not apply to QED and QED should not be responsible for either the registration fees or penalties under this section. Consequently, Section 138–41 of the Township Code, requiring the registration and imposition of the Business Privilege Tax, applies only to those businesses with an "actual place of business" in the Township, and is limited to those businesses which meet the "base of operations" standard recited by the Supreme Court in *Gilberti*. QED is not, therefore, responsible to register for or be liable for Lower Merion Township's Business Privilege Tax, nor for the interest and penalties associated for the non-payment thereof.

QED argues that the trial court erred by not awarding counsel fees to it because the Township wrongfully commenced and then selectively enforced and prosecuted this case against QED in the face of well-settled law.[9]

██ The trial court, in denying attorney fees, concluded that the Township did not engage in a deliberate or purposeful dis-

---

8. Article IV of the Township Code is cited, in pertinent part, *supra* at n. 3.

9. QED argues that the Business Privilege Tax is being unequally enforced within the Township as evidenced by 1) the failure of the public records in the prothonotary's office or from the Township to demonstrate any other taxpayer against whom the Township commenced litigation in Common Pleas Court and 2) the admission by the Township that it exempted from the tax various other businesses similar to QED who also transact business within the Township, and who also do not have principal places of business there (UPS, Federal Express, funeral homes, archi-

tects, interior designers, pool and HVAC contractors, lawn services, for example).

Conroy testified that the reason certain businesses are exempted from the business privilege tax is because they do not perform a "taxable service" within the Township. The Township contends that QED performs the actual service within the Township, i.e. the repair or improvement to the real property, while the other businesses supposedly perform the actual services outside the Township. The trial court found this to be a rational basis for creation of the classification and a sufficient basis to deny the awarding of attorney fees.

crimination in enforcing the tax against QED.[10] We do not need to reach QED's contention that the trial court did not address the *uniformity of the enforcement* of the tax as being non-discriminatory, since QED is not entitled to attorneys fees in any circumstance.

■ While the trial court correctly decided to deny QED attorney fees, it did so based on an incorrect standard. In order to make a determination of attorney fees in this case, absent any provision for such in the LTEA, the court must follow Section 2503(7) of the Judicial Code, 42 Pa. C.S. § 2503(7), which provides that counsel fees may be awarded as a sanction against a party for dilatory, obdurate or vexatious conduct during the pendency of a matter. Conduct prior to or following the pendency of the action cannot, however, form a basis for an award of counsel fees. *Westmoreland County Industrial Development Authority v. Allegheny County Bd. Of Property Assessment, Appeals and Review*, 723 A.2d 1084, 1086 (Pa.Cmwlth.1999) (the County's improper action in placing property on its tax rolls, which action occurred before the litigation commenced, could not provide a basis for the award of counsel fees).

As QED points out, the trial court did fail to recognize the discriminatory application of this tax by the Township among the vendors servicing the Township. The classification created by the Township, i.e., "performing actual services within the Township," *does*, on its face, apply to delivery services, in-home appliance repair companies, deliveries to businesses and residences, visiting nursing personnel, cleaning services, and the like. All of these vendors, like QED, come into the Township and onto the resident premises to perform their "service," thereafter leave the Township for their "base of operations" and none of them are taxed or pursued for non-payment or non-registration merely because the Towship's collector of this tax deems the other vendors not to be a *"taxable* service," while treating QED's service as taxable, constituting a non-uniform application of the tax by the Township.

However, even if the trial court had permitted QED's cross-examination of the Township in order for QED to prove non-uniformity of the application of the tax, such enforcement of the tax by the Township is still conduct prior to the pendency of the litigation and cannot form a basis for the award of counsel fees. *See, Westmoreland County Industrial Development Authority.*

Since, on direct and cross-examination, the trial court sustained the Township's objections to QED's inquiries requesting a listing of other taxpayers paying the tax, the refusal of the Township to provide such information does not amount to being dilatory, obdurate or vexatious, because, even though it occurred during the pendency of the action, the trial court, in properly exercising its discretion, sustained the Township's conduct.

In addition, consideration must be given to the Township's obtaining and relying on

---

**10.** While acknowledging that the Township does not enforce the tax against every business that falls within its scope, the trial court found that the Township Finance Department makes an ongoing, comprehensive effort to identify those businesses subject to the Business Privilege Tax.

The trial court, relying on the fact that the Business Privilege Tax was first imposed in 1977, when the Township had approximately 2,800 taxpayer accounts and it now has approximately 5,300 accounts, concluded that the Township applies the ordinance and regulations so as to impose the business privilege tax on contractors who perform work within the Township and that the ongoing additions resulted from such activities as the Finance Department working internally with the various Township departments, checking local newspapers, checking deed registrations, taking information from persons who telephone the Finance Department, checking directories in hospitals and commercial buildings, reviewing general mailings coming to the Township Building and inspecting signage along the streets.

What is omitted from the findings is that the Township has no written policies and takes each case on a case-by-case basis, as testified to by Conroy. RR 101.

its Solicitor's opinion, which also provides substantial evidence supporting a finding that the Township's conduct was not dilatory, obdurate or vexatious because it was acting on the advice of its Solicitor. Although we reject the trial court's reasons, we agree that the trial court properly denied attorney's fees.

The decision of the trial court is reversed as to the tax liability of QED, in accordance with the accompanying order, but affirmed as to the denial of attorney's fees.

## ORDER

NOW, August 13, 1999, the Final Decree of the Court of Common Pleas of Montgomery County, Pennsylvania, No. 91–19848, dated January 26, 1998, declaring the court's November 3, 1997 Decree Nisi as the final order of court in this matter is hereby REVERSED insofar as the Judgment entered in favor of the plaintiff, Lower Merion Township, and against the defendant, QED, Inc., for $23,-412.00 is VACATED and SET ASIDE in accordance with the attached opinion.

The Court is directed to enter JUDGMENT FOR THE DEFENDANT, QED, INC., and QED is not liable for the Business Privilege Tax of Lower Merion Township.